UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| SUMMER WOOD PROPERTY OWNERS ASSOCIATION, INC. | ) ) ) | Civil Action No.: 2:17-cv-3504-BHH |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **OPINION AND ORDER** |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) ) ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant Pennsylvania National Mutual Casualty Insurance Company's ("Defendant" or "Penn National") motion for summary judgment. (ECF No. 40). For the reasons set forth in this Order, Defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiff Summer Wood Property Owners Association, Inc. ("Plaintiff"), brings this breach of contract and bad faith action as the assignee of Portrait Homes-South Carolina LLC and Portrait Homes-Summer Wood LLC ("Portrait"), which served as the general contractor for a townhome project known herein as the Summer Wood Project. Plaintiff sued Portrait, among other parties, in state court to recover damages for alleged construction defects related to the Summer Wood Project ("Underlying Litigation").[1] Portrait required its subcontractors to carry insurance policies

---

[1] The Court notes a discrepancy in the cases the Parties refer to as comprising the Underlying Litigation. Both Parties refer to docket number 2015-CP-10-0100 filed in the Charleston County Court of Common Pleas. *See* (ECF No. 1-1 at ¶ 18, ECF No. 40-1 at 2 n.1). However, Plaintiff

providing for the general indemnification of Portrait relating to claims for property damage or bodily injury arising from work performed, materials furnished, or services provided by the subcontractors with respect to the Summer Wood Project. (ECF No. 1-1 at ¶ 19). Pertinent to the claims at issue here, Portrait entered into a contract with JJA Framing aka Jose Castillo aka JJA Construction Inc. ("JJA") for work to be performed at the Summer Wood Project. (*Id.* at ¶ 45). Plaintiff asserts that Defendant issued commercial general liability policies to JJA with effective dates of December 5, 2004 through January 31, 2008 (the "Penn National Policies"). (*Id.* at ¶ 44). The plaintiffs in the Underlying Litigation named JJA as a defendant and asserted claims against Portrait for allegedly defective work performed by JJA. (*Id.* at ¶¶ 47-48). Portrait ultimately settled the Underlying Litigation by paying $3,000,000 to Plaintiff and assigning to Plaintiff "any claims relating to the Portrait Entities' status as an additional insured under the insurance policies issued to the subcontractors." (*Id.* at ¶ 24).

Plaintiff now alleges that during the Underlying Litigation, Defendant failed to recognize Portrait "as an additional insured" and failed "to provide what was due under the policies," specifically, indemnification and a defense. (ECF No. 1-1 at ¶¶ 49, 83). Plaintiff further asserts that Defendant acted in bad faith in one or more of the following ways:

> Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies, including third-party claims arising under liability policies.
>
> Not attempting in good faith to effect prompt, fair, and equitable settlement of claims, including third-party liability claims, submitted to it in which liability has become reasonably clear.
>
> Compelling policyholders or claimants, including third-party claimants under liability policies, to institute suits to recover amounts reasonably due or payable

---

refers to a second case filed in Berkeley County, 2012-CP-08-3065, (ECF No. 1-1 at ¶ 18); while Defendant refers to a second case filed in Charleston County, 2015-CP-10-02432, (ECF No. 40-1 at 2 n.1).

2

> with respect to claims arising under its policies by offering substantially less than the amounts ultimately recovered through suits brought by the claimants or through settlements with their attorneys employed as a result of the inability of the claimants to effect reasonable settlements with the insurers.
>
> Engaging in other practices which constitute an unreasonable delay in paying or an unreasonable failure to pay or settle in full claims, including third-party liability claims, arising under coverages provided by its policies.

(*Id.* at ¶ 91). As a result, Plaintiff seeks damages, fees, and costs.

This matter was removed to this Court on December 29, 2017, (ECF No. 1), after Defendant had filed an answer, (ECF No. 4).[2] The case was reassigned to the undersigned on September 10, 2018. (ECF No. 37). On October 8, 2018, Defendant filed the pending motion for summary judgment arguing that Plaintiff's claims fail as a matter of law because (1) Portrait suffered no damages as a result of Defendant's alleged failure to defend or indemnify Portrait in the Underlying Litigation; and (2) Portrait failed to perform its obligations under the Penn National Policies. (ECF Nos. 40, 40-1). Plaintiff filed a response, (ECF No. 41), to which Defendant filed a reply, (ECF No. 42). The Court exercises jurisdiction under 28 U.S.C. § 1332, and therefore applies South Carolina law to the issues presented below. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938) (holding federal courts in diversity cases apply the law of the forum state).

## **LEGAL STANDARD**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth

---

[2] Plaintiff originally named several defendants, four of which remained at the time of removal. Plaintiff thereafter dismissed three of those four defendants during the pendency of this litigation. *See* (ECF Nos. 35, 46). Penn National is the sole remaining Defendant.

3

specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## **DISCUSSION**

Defendant argues that Plaintiff's claims fail because Portrait suffered no damages, which is a necessary element of both a claim for breach of contract and for bad faith. Additionally, Defendant argues, Portrait failed to comply with the conditions of the Penn National Policies because it did not provide notice to Defendant with respect to the claims asserted in the Underlying Litigation. (ECF No. 40-1 at 6-16). In response, Plaintiff does not dispute that Portrait was fully defended and indemnified by its liability insurer, Admiral Insurance Company ("Admiral"), but

contends that Admiral's payments constitute a collateral source that the Court should not consider in determining whether Portrait incurred damages that Plaintiff can recover as assignee. Additionally, Plaintiff asserts, Portrait did in fact request indemnification and a defense from Penn National "long before" Admiral settled the claim. (ECF No. 41 at 1). In reply, Defendant argues that the collateral source rule does not apply to Plaintiff's claims and, furthermore, Defendant has no documentation in its files that Portrait tendered the Underlying Litigation to Penn National. (ECF No. 42).

At the outset, the Court notes that the Parties do not dispute the terms or temporal scope of the Penn National Policies, Portrait's status as an additional insured under the Penn National Policies, Plaintiff's designation as Portrait's assignee, or that Admiral defended Portrait in the Underlying Litigation and funded the $3,000,000 settlement paid to Plaintiff.

### A. The Issue of Damages

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." *Auto Owners Ins. Co. v. Rollison*, 663 S.E.2d 484, 487 (S.C. App. 2008) (citing *Estate of Revis v. Revis,* 484 S.E.2d 112, 116 (S.C. App. 1997)). On the other hand, claims for bad faith refusal to pay first party benefits due under an insurance contract sound in tort. *Tadlock Painting Co. v. Maryland Cas. Co.*, 473 S.E.2d 52, 53 (S.C. 1996) (reaffirming that "there is an implied covenant of good faith and fair dealing in every insurance contract 'that neither party will do anything to impair the other's rights to receive benefits under the contract,'" and that "if an insured can demonstrate bad faith or unreasonable action by the insurer *in processing a claim* under their mutually binding insurance contract, he can recover consequential damages in a tort action") (quoting *Nichols v. State Farm Mut. Auto. Ins. Co.,* 306 S.E.2d 616 (1983)). The Parties do not dispute that the elements of a

breach of contract claim include (1) the existence of a contract; (2) its breach; and (3) damages caused by the breach. *Hotel and Motel Holdings, LLC v. BJC Enterprises*, 780 S.E.2d 263, 272 (S.C. App. 2015). Nor do they dispute that the elements of a claim for bad faith refusal to pay first party benefits under an insurance contract are as follows:

> (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; and (4) causing damage to the insured.

*Crossley v. State Farm Mut. Auto. Ins. Co.*, 415 S.E.2d 393, 396-97 (S.C. 1992). *See* (ECF No. 41 at 3). "If the insured proves the insurer's conduct was willful or in reckless disregard of his rights under the contract, the insured also may recover punitive damages." *Crossley*, 415 S.E.2d at 397.

Accordingly, the Parties agree that to prevail in this action Plaintiff must establish that Portrait suffered damages as a result of Defendant's failure to indemnify and failure to provide a defense. *See W.M. Kirkland, Inc. v. Providence Washington Ins. Co.*, 216 S.E.2d 518, 520-21 (S.C. 1975) (holding that an assignee holds no greater rights than those held by the assignor at the time of the assignment). Plaintiff asserts in the complaint that Portrait was damaged "in the amount of the attorney fees and expenses incurred in defending the Portrait Entities in the Summer Wood Litigation, and in the amount of the consideration required to obtain the settlement." (ECF No. 1-1 at ¶¶ 85, 93).

**1.     Arguments**

Defendant contends that Plaintiff can establish no damages because Admiral fully defended and indemnified Portrait, including payment of Portrait's attorney fees, litigation costs, and the settlement amount. (ECF No. 40-1 at 8). Defendant relies on *Hartford Accident and Indemnity*

*Company v. South Carolina Ins. Co.*, 166 S.E.2d 762, 765 (S.C. 1969) and *Sloan Constr. Co., Inc. v. Cent. Nat'l. Ins. Co. of Omaha*, 236 S.E.2d 818 (1977) to assert that under South Carolina law, "an insured who suffered no damages because it did not pay any of the attorneys' fees or other costs incurred to defend itself cannot assert an action against an insurer for failing to defend the insured." (ECF No. 40-1 at 6-7).

The *Hartford* case involved an action by an excess automobile liability insurer against the primary automobile liability insurer to recover expenses the excess insurer incurred in its defense of the common insured. The excess insurer took over defense of the action prior to trial, and the jury returned a verdict against the insured. The excess insurer contended that its defense of the action was prejudiced by the withdrawal of the primary insurer, and it brought a separate action to recover the cost of defending the action. *Hartford*, 166 S.E.2d at 764. On appeal, the South Carolina Supreme Court affirmed that the excess insurer was not entitled to recover its costs. The court explained that the allegations of the underlying complaint brought the claim of the injured plaintiff within the liability coverage afforded to the insured by the respective policies issued by the primary and excess insurers; therefore, the excess insurer's obligation to defend the action "was absolute," and "[t]he costs and expenses incurred by [the excess insurer] should be borne by it because such was an obligation that it owed to its insured under the policy contract." *Id.* at 765. The court further explained that each of the liability policies at issue contained a defense agreement and therefore neither insurer could object "if it is required to pay the costs and expenses which it incurred in defense of the action because such is the performance of the undertaking for which it accepted a premium." *Id.* In response to the excess insurer's argument that it was subrogated by the terms of its policy to the rights of the insured against the primary insurer, the court determined that the insured "never had a right of recovery against any person or organization because of fees

7

paid to the attorney"; "[c]onsequently, the subrogation provision of the policy issued to the insured by [the excess insurer] had no application . . . ." *Id.* The court concluded by stating that the excess insurer "had an interest of its own to protect in [the action against its insured] and was entitled to employ attorneys, at the time of the institution of the suit, to participate in its defense for that purpose." *Id.*

Defendant argues that *Hartford* is instructive, contending that the court therein rejected the excess insurer's subrogation argument on the basis that "the insured incurred no out-of-pocket expenses." (ECF No. 40-1 at 7). However, the court's explicit holding provides greater context for its ruling:

> [the excess insurer's] obligation to defend existed from the time the action was instituted and continued until it fulfilled its obligation under its policy and this included the payment of the items of expense provided for in said policy. The assumption of the defense by [the excess insurer] was merely the beginning of the discharge by it of a duty owed to the insured from the beginning. The payment of the cost and expenses in the defense of the [] action was the fulfillment of its contract to the insured. It follows that [the excess insurer] has no claim, by way of subrogation or otherwise, to be reimbursed by [the primary insurer] for defending the suit as to which it alone had the remaining obligation for the payment of any claim within its policy coverage.

*Id.* at 766. Such a rationale is consistent with the *Hartford* court's finding, reflected throughout the opinion, that the insurer's obligation to defend the action was "absolute," and, therefore, the insurer should be made to bear the costs and expenses incurred by it because such expenditures were an obligation that the insurer owed to its insured under the policy contract. The Court notes that *Hartford* would be more instructive if Admiral were suing Defendant here.

The second case Defendant relies on, *Sloan Constr. Co., Inc. v. Central Nat'l. Ins. Co.*, is closer to the facts of this case. In *Sloan*, an insured construction company was the defendant in a civil action and tendered the litigation to its two insurance carriers, both of which had a duty to defend the insured. One of the insurance carriers, Central, nonetheless refused to defend, and the

8

second carrier, Liberty Mutual, undertook the defense. The insured prevailed and the costs of defending the lawsuit were taxed against the losing plaintiff, but execution resulted in a "nulla bona" return and the insured ultimately paid the attorney fees and costs with proceeds of a loan made pursuant to a loan receipt agreement with Liberty Mutual. *Sloan*, 236 S.E.2d at 819. The insured then instituted an action against Central to recover the attorney fees and costs plus interest. The South Carolina Supreme Court held that the insured was not entitled to recovery because it was not damaged by Central's refusal to defend on account that the insured "was never legally obligated to pay the costs of the defense." *Id.* at 820. In reaching its decision, the court relied at least in part on the fact that the lawsuit "was concluded without any loss or liability to [the insured]." The court reasoned that "[a]bsent any damage flowing to [the insured] as a result of Central's refusal to defend, [the insured] had no right to recovery against Central." *Id.* at 820.

Plaintiff argues that *Sloan* is inapposite because it (and *Hartford*) involve a party "seeking to recover for defense costs, not for indemnity." (ECF No. 41 at 4). More instructive, Plaintiff submits, is *Otis Elevator, Inc. v. Hardin Constr. Co.*, 450 S.E.2d 41 (S.C. 1994), in which the South Carolina Supreme Court affirmed a jury verdict that Otis Elevator was entitled to indemnity from Hardin Construction but reversed the trial court's order reducing the jury's verdict to offset the amount of money Otis Elevator's insurer had paid the injured party. Otis Elevator was Hardin Construction's elevator subcontractor. While Otis Elevator completed installation of the elevators, it permitted Hardin Construction to use one of the elevators on a temporary basis pursuant to an agreement by which Hardin Construction assumed responsibility for loss or damage occasioned by any accident relating to the elevator. A carpeting subcontractor subsequently fell down the shaft of the elevator and sued Otis Elevator on several counts. Otis Elevator asked Hardin Construction to defend and indemnify it; Hardin Construction refused. Otis Elevator ultimately

9

settled the lawsuit and thereafter sued Hardin Construction for indemnification. On appeal, the court affirmed the finding that Otis Elevator was entitled to indemnity and then addressed Otis Elevator's basis for appeal, which Plaintiff contends is analogous to the present issue. The court determined that the trial court had erred in reducing the jury verdict, explaining that "if one party is entitled to indemnity from another, the right to indemnity is not defeated by the fact that the loss to be indemnified for was actually paid by an insurance company." *Otis Elevator*, 450 S.E.2d at 45-46. In other words, Plaintiff asserts, the collateral source rule applies here, as it did in *Otis Elevator*, to ensure that Plaintiff, as Portrait's assignee, receives the benefit of its insured status with Defendant, regardless of Admiral's defense in the Underlying Litigation. (ECF No. 41 at 6) (citing *South Carolina Jurisprudence*, Damages § 11, p. 32 (1992) ("The defendant should not benefit from payments . . . provided for by the plaintiff's foresight, e.g., payment of insurance premiums. If anyone is to have a windfall, the cases argue, it should be the wronged plaintiff, not the wrongdoing defendant.")). Plaintiff contends, "Admiral's payment on behalf of Portrait is a collateral source that Penn National is not entitled to take advantage of," and, to illustrate the point, asserts, "if one party [Portrait] is entitled to indemnity from another [Penn National], the right to indemnity is not defeated by the fact that the loss to be indemnified for was actually paid by an insurance company [Admiral]." (*Id.* at 7 (quoting *Otis Elevator*, 450 S.E.2d at 45-46) (alterations in brief)).

Defendant's rejoinder on reply is that the court in *Otis Elevator* applied the collateral source rule to a contractual indemnity claim asserted against a negligent party found to have been responsible for the underlying harm for which indemnity was sought. (ECF No. 42 at 4). Defendant asserts that it is neither a tortfeasor nor a "wrongdoer" who "caused the damages at issue" in the Underlying Litigation and therefore "owes contractual indemnity to Portrait Homes."

10

(ECF No. 42 at 5). Rather, Defendant submits, according to Plaintiff, it "is a co-insurer (along with Admiral) of Portrait Homes that should have provided coverage to Portrait Homes under the Penn National Policies in relation to the claims asserted against Portrait Homes in the Underlying Construction Defect Litigation." (*Id.* at 5-6).

### 2. Application and Findings

The purpose of the collateral source rule is to prevent a tortfeasor from obtaining a windfall. *See, e.g., Dixon v. Besco Eng'g, Inc.,* 463 S.E.2d 636, 640 (S.C. App. 1995). More specifically, the collateral source rule provides that "compensation received by an injured party from a source wholly independent of the wrongdoer will not reduce the amount of damages owed by the wrongdoer." *In re W.B. Easton Constr. Co., Inc.*, 463 S.E.2d 317, 318 (S.C. 1995). A source is wholly independent of the wrongdoer "when the wrongdoer has not contributed to it and when payments to the injured party were not made on behalf of the wrongdoer." *Mount v. Sea Pines Co., Inc.*, 523 S.E.2d 464, 465 (S.C. App. 1999) (citation omitted).

    a. <u>Breach of Contract</u>

The Court agrees, with respect to the breach of contract claim, that the pleadings governing this action do not suggest that Penn National is a tortfeasor or wrongdoer or is otherwise "at fault"; rather, the allegation is that Penn National is in breach of its agreement with Portrait. As such, the rationale set forth in *Otis Elevator* and underlying the collateral source rule does not apply here.

Another court in this District reached a similar conclusion in considering whether to apply the collateral source rule to exclude an offset for the funds received by an insured to reimburse it for the defense costs the insured incurred in an underlying lawsuit, and found that to so apply the collateral source rule would actually result in "an unjust windfall and double recovery" for the insured. *Crossman Communities of North Carolina, Inc. v. Harleysville Mut. Ins. Co.*, No. 4:09-

cv-1379-RBH, 2013 WL 5437712, at *26 (D.S.C. Sept. 27, 2013). In so finding, the *Crossman* court considered that while South Carolina has not yet addressed the issue, "the clear majority of courts have rejected the application of the collateral source rule where more than one insurance policy or third party provides coverage for the same loss." *Id.* (collecting cases). The court further explained that the "national consensus exists for good reason," considering that tort law is concerned with deterrence and punishment, and an award of damages for breach of contract is intended to "put the plaintiff in as good a position as he would have been in if the contract had been performed." *Id.* at *27 (quoting *Minter v. GOCT, Inc.,* 473 S.E.2d 67, 70 (S.C. App. 1996)). *See Branche Builders, Inc. v. Coggins,* 686 S.E.2d 200, 202 (S.C. App. 2009) (explaining that contractual damages are measured by the amount that the non-breaching party would have received if the contract had been performed as promised); 22 Am.Jur.2d Damages § 45 (limiting a party's recovery in a breach of contract action to "the loss that he has actually suffered by reason of the breach"). The *Crossman* court concluded that "[a]pplying the collateral source rule to contract law would 'contravene this principle by awarding the non-breaching party more damages than necessary to compensate it for the breach." *Crossman*, 2013 WL 5437712, at *27 (quoting *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.,* 579 N.W.2d 823, 830 (Iowa 1998)).

The Court agrees with the *Crossman* court that the collateral source rule does not apply to the breach of contract claim; and further finds that under *Sloan*, Plaintiff cannot establish damages so as to state a claim for breach of contract. Accordingly, the Court grants the motion for summary judgment as to this claim.

    b. <u>Bad Faith</u>

However, the Court is not persuaded by the motion for summary judgment that Plaintiff cannot establish damages with respect to the bad faith claim. As stated above, bad faith claims

sound in tort. *See Tadlock Painting Co.*, 473 S.E.2d at 53. The South Carolina Supreme Court has expressly held that an insured can maintain a claim for bad faith separate and apart from a claim for breach of contract. *Id.* at 54, 55 (holding that "a bad faith action exists separately from an action in contract," and explaining that "the benefits due an insured are not limited solely by those expressly set out in the contract"). *See Founders Ins. Co. v. Richard Ruth's Bar & Grill LLC*, Nos. 2:13-cv-3035-DCN, 2:14-cv-03272-DCN, 2016 WL 3192811, at *5 (D.S.C. Jun. 8, 2016) (explaining that the *Tadlock* court "underscored its holding from previous cases that the covenant of good faith and fair dealing extends not just to the payment of a legitimate claim, but also to the manner in which it is processed").

Defendant's sole argument in support of summary judgment on the bad faith claim is that Plaintiff cannot establish damages. However, the case Defendant relies on for support, *Sloan*, is not instructive as to when damages are available for bad faith. The *Sloan* court considered the relatively narrow issue of whether the insured was entitled to recover attorneys' fees and costs, plus interest, from the insurer that had refused to defend, when the insured did not pay for those fees and costs out of pocket. The reasoning asserted by the court in *Sloan* suggests that the court (1) was concerned that Liberty Mutual was attempting through the loan agreement with the insured to improperly seek contribution from its co-insurer, and (2) viewed the matter of damages within the framework of contract law, i.e., to compensate for the loss the insured actually suffered. *See Sloan*, 236 S.E.2d at 821 ("[u]nder general principles of contract law, no right to recovery exists in such a situation"). It is not at all clear that the *Sloan* court was considering the question of damages in a bad faith tort context when it held that the insured, who had prevailed in the underlying litigation, had not been damaged by the insurer's refusal to defend. Indeed, the purpose of awarding damages for a tort claim is, at least in part, to deter and punish as much as to make an

13

injured party whole.

In finding that neither *Sloan* nor *Hartford* establishes that Plaintiff cannot demonstrate damages with respect to the bad faith claim, and in further finding that it appears under South Carolina law that the collateral source rule could apply to claims for bad faith,[3] the Court concludes that Defendant has not met its burden under Rule 56 of showing it is entitled to judgment as a matter of law as to the bad faith claim.[4] The Court therefore considers Defendant's second contention that Portrait did not comply with certain conditions of the Penn National Policies.

**B.     Whether Portrait Tendered the Underlying Litigation to Penn National**

Defendant asserts that Portrait did not comply with the conditions for coverage under the Penn National Policies in that Portrait failed to provide any notice of its claim and failed to request coverage as an additional insured. Plaintiff asserts that Portrait's attorneys mailed a letter of tender

---

[3] The Court notes that under Maryland law, an insured can pursue only a contract claim, not a tort claim, against an insurer for failure to defend. *Mesmer v. Maryland Automobile Insurance Fund,* 725 A.2d 1053, 1058-60 (Md. App. 1999). However, the Court is not aware of similar law in South Carolina.

[4] This finding notwithstanding, the Court notes some skepticism as to whether the collateral source rule is applicable *here*. The collateral source rule serves to ensure that a wrongdoer will not benefit from payments made from another source to compensate for the injuries caused by the wrongdoer. Although not raised by Defendant, it cannot be said that Admiral's payments to Portrait were expended to compensate Portrait for an injury caused by Penn National. Admiral expended funds to defend Portrait and to settle the Underlying Litigation, not to make Portrait whole following an injury caused to Portrait by Penn National. *Cf. Atmel Corp. v. St. Paul Fire & Marine Ins. Co.*, 430 F. Supp. 2d 984, 987 (N.D. Cal. 2006) (holding that collateral source rule did not apply, because one insurer's contribution toward defense was not for any injury resulting from the other insurer's actions, and agreeing that "the monies paid by Royal on behalf of Atmel toward the defense and settlement of the *Seagate* action are not a collateral source as the rule is defined and applied in California . . . [because] . . . Royal's contribution toward Atmel's defense and settlement of the *Seagate* action was not compensation for tort damages allegedly caused by St. Paul, and that even if Atmel is an 'injured party' seeking to recover compensation for tort damages inflicted by St. Paul as a tortfeasor, the monies paid by Royal were not 'compensation for tort damages inflicted by the tortfeasor.'"). As in *Atmel,* Penn National did not cause the injury, i.e., the Underlying Litigation.

14

to Defendant dated August 31, 2015. Both Parties offer affidavits in support of their respective positions.

Defendant asserts in its motion that on receipt of the complaint in the instant matter, it "searched its files for any notice by Portrait Homes to Penn National or request for additional insured coverage under the Penn National Policies," and that while it "located a letter from counsel for the plaintiff in the underlying litigation requesting that Penn National provide coverage to its named insured (JJA)," Defendant "did not find (and has not since found) any correspondence in its file from (or on behalf of) Portrait Homes providing any notice of the underlying litigation or requesting that Penn National provide additional insured coverage to Portrait Homes under the Penn National Policies for the claims at issue." (ECF No. 42 at 8-9). Defendant offers the affidavit of its claims specialist, Stephen Oliver, for support. (ECF No. 40-2). Mr. Oliver attests that he was involved with the investigation of the claims received in relation to the Penn National Policies, including claims arising out of the Summer Wood Project; he has "first-hand knowledge of the communication received in relation to the Penn National Policies as well as the efforts undertaken by Penn National to investigate such claims"; and Portrait "never provided notice to Penn National of the [Underlying Litigation]," and never "forwarded copies of the complaints or other pleadings in the underlying litigation to Penn National, or otherwise notified Penn National that it was claiming additional insured status or seeking coverage as an additional insured under the Penn National Policies issued to JJA."[5] (ECF No. 40-2 at ¶¶ 4-5).

In response, Plaintiff relies on the affidavit of Amber Gilliam, who, as a paralegal employed with the Hood Law Firm, LLC, worked with attorneys who represented Portrait in the

---

[5] As noted above, when referring to the Underlying Litigation, Defendant refers to civil action nos. 2015-CP-10-00100 and 2015-CP-10-02432, but not civil action no. 2012-CP-08-3065. *See, e.g.,* (ECF No. 40-2 at ¶ 5).

15

Underlying Litigation. (ECF No. 41-2). Ms. Gilliam attests that "[i]n representing Portrait in the [Underlying Litigation], we tendered the defense and indemnity of Portrait as an additional insured to a number of insurers who had issued liability policies to the subcontractors who were involved in the [Underlying Litigation]." (*Id.* at ¶ 6). Ms. Gillam further attests as follows:

> The standard practice was to send a tender letter via certified mail, return receipt requested. I was responsible for maintaining in our files any executed return receipts we received back in the mail. Attached as Exhibit A to this Affidavit is a copy of a tender letter issued by Caroline Niland on behalf of Portrait to Pennsylvania National Insurance Co. dated August 31, 2015. A copy of that tender letter was maintained in our files. Attached as Exhibit B to this Affidavit is a copy of the executed return receipt received back in the mail associated with that tender letter. The original, executed return receipt was maintained in our files.

(*Id.* at ¶¶ 7-12). The document attached to Ms. Gilliam's affidavit is a copy of a letter, composed on the Hood Law Firm's letterhead and dated August 31, 2015, which references in capital letters the subject, "additional insured tender." (ECF No. 41-2). The letter identifies Jose Castillo d/b/a JJA Framing as the primary insured, "Portrait Homes-South Carolina, LLC, Portrait Homes-Summer Wood, LLC and Pasquinelli Homebuilding, LLC" as the additional insured, and Pennsylvania National Insurance Co. as the carrier. *Id.* The letter further references the policy number, start and end dates, and the claim as the underlying state court litigation.[6] *Id.* The letter states:

> Portrait's contract with your Primary Insured expressly required it to obtain insurance policies that name Portrait by separate endorsement as an additional insured . . . .
>
> Portrait is entitled to a defense and to indemnification as an additional insured under the referenced policies for any and all sums that hereinafter are paid or expended by Portrait to defend against and to resolve these potential claims. Moreover, if Portrait is or may be an additional insured under any other applicable policies with the insurer, demand is hereby made for indemnity pursuant to those policies.

---

[6] The civil actions Ms. Gilliam cites in her affidavit as comprising the Underlying Litigation match the civil actions that Defendant cites. *See* (ECF No. 41-2 at ¶ 4).

(ECF No. 41-2 at 5). Also attached to Ms. Gilliam's affidavit is a copy of the return receipt for certified mail addressed to Pennsylvania National Insurance Co. in Harrisburg, Pennsylvania, dated September 3, 2015. (*Id.* at 6).

In reply, Defendant asserts only that it did not receive the Hood Law Firm's letter. Defendant does not contend that the letter is insufficient to satisfy Portrait's duty to tender the claim or otherwise provide notice to Defendant under the Penn National Policies. Nor does Defendant assert a separate basis on which to find that Portrait did not satisfy its obligations under the Policies.[7]

"Where a question exists as to the failure of an insured to comply with the notice requirements contained in a liability insurance contract, the burden of proof rests with the insurer." *Vt. Mut. Ins. Co. v. Singleton*, 446 S.E.2d 417, 421 (S.C. 1994). The Court finds that the copy of the letter and the certified mail receipt create a genuine issue of material fact as to whether Portrait satisfied its obligations under the Penn National Policies to inform Defendant of the Underlying Lawsuit. *See Anderson*, 477 U.S. at 249 (instructing that the court is not to weigh the evidence, but rather determine if there is a genuine issue of fact); *Founder Ins. Co.*, 2016 WL 3192811, at *5 ("When conflicting evidence is presented, summary judgment on the issue of bad faith is generally inappropriate . . . .") (quoting *Shiftlet v. Allstate Ins. Co.*, 451 F. Supp. 2d 763, 772 (D.S.C. 2006)). Accordingly, Defendant has not carried its burden under Rule 56 with respect to the bad faith claim and the Court denies the motion for summary judgment as to this claim.

## **CONCLUSION**

After careful consideration of the Parties' briefs, the associated record, and the applicable

---

[7] Defendant asserts that Plaintiff provided the letter only after discovery had closed, but Defendant does not argue that the late production should result in sanctions such that Plaintiff would be precluded from offering the letter as proof of its claims.

17

law, the Court hereby grants Defendant's motion for summary judgment (ECF No. 40) with respect to the breach of contract claim and denies the motion with respect to the bad faith claim.

**IT IS SO ORDERED.**

/s/  Bruce Howe Hendricks
Hon. Bruce Howe Hendricks
United States District Judge

September 16, 2019
Charleston, South Carolina